252

In re GIORGIO SHELLFISH
CORP., Debtor.

Allied Capital Corporation and
Business Mortgage Investors,
Inc., Plaintiffs,

v.

Martin Altchek, as Trustee for the Martin Altchek, M.D., P.C., 401K Pension Plan, F/B/O Martin Altchek, and RPT Metro Equities Limited Partnerships, Defendants.

Bankruptcy No. 00–17485–353.
Adversary No. 00–1582–353.

United States Bankruptcy Court,
E.D. New York.

July 12, 2001.

Gabriel Del Virginia, New York City, for the Debtor.

Dickstein Shapiro Morin & Oshinsky, LLP, Washington, D.C., By Daniel Litt, for Allied Capital.

Golenbock, Eiseman, Assor & Bell, New York City, By Jeffrey Golenbock, for Allied Capital.

Greenberg Traurig, LLP, New York City, By John Grant, Jr., for Martin Altchek.

## DECISION AND ORDER ON PRIORITY AND EXTENT OF LIENS

JEROME FELLER, Bankruptcy Judge.

Before the Court is a motion for summary judgment by Martin Altchek, as Trustee for the Martin Altchek, M.D., P.C., 401K Pension Plan, F/B/O Martin Altchek, ("Altchek") for the relief sought in his counterclaim. In essence, Altchek seeks a declaratory judgment, declaring the priorities between the plaintiffs, Allied Capital Corporation and Business Mortgage Investors, Inc. (collectively "Allied") and the defendants, Altchek and RPT Metro Equities Limited Partnership ("RPT") (collectively the "Defendants"), to be as set forth in the Amended Plan of Reorganization (the "Plan"), confirmed by this Court on August 31, 1994 and related documents. After the debtor's (the "Debtor") default, according to Altchek, the priority of payment ahead of his subordinated debt is a specific and capped sum of $1,600,000, without interest, fees and other charges. After payment of a monetary amount, which is in dispute, to Allied, who is an assignee of RPT's senior secured claim, it is conceded by all parties that RPT's small second mortgage obtained for real estate tax advances after confirmation of the Plan and not assigned to Allied maintains a second priority, followed by Altchek's third mortgage, followed by payment of the balance of Allied's claim. Allied has cross-moved for partial summary judgment, for the relief sought in Count One of its complaint for declaratory judgment and for this Court to determine, as well, the priority and extent of its liens. Specifically, Allied requests this Court to find that Allied's right to interest, fees and costs with respect to its $1.6 million priority claim is senior to Altchek's rights as a junior lienholder.

## FACTS AND PROCEDURE

Upon review of the pleadings, submissions, affidavits, and exhibits filed, the following material and relevant facts are found not to be in dispute.

On August 31, 1994, this Court confirmed the Debtor's Plan in its first Chapter 11 case. Under the Plan, RPT agreed with the Debtor that notwithstanding RPT's first priority secured claim of more than $3 million, it would subordinate to Altchek that portion of its secured claim that exceeded $2,000,000. Altchek, in turn, agreed to lend the Debtor on a secured basis $675,000 and to subordinate such loan to RPT's first priority claim. Accordingly, the Plan contains the following relevant language with respect to the order of priority between RPT and Altchek:

"The order of priority and payment in the event of a default and failure to cure shall be as follows:

(a) $2,000,000 of RPT's Secured Claim less any payments made to RPT pursuant to the Plan;

(b) Subordinate Loan by Dr. Altchek less any payments made pursuant to the Plan; and

(c) Balance of RPT Secured Claim."

(Altchek Exhibit A at 8).[1]

The Plan provided the Debtor with two alternatives for satisfying RPT's restructured first priority $2 million lien: (1) pay RPT $1.8 million within ten days of entry of the confirmation order; or (2) reduce RPT's restructured first priority $2 million claim by $400,000 within fifteen days of the effective date of the Plan, and repay RPT's remaining debt through monthly payments of interest for four years with a balloon payment of $1.6 million at maturity. (Altchek Ex. A at 7–8). The Debtor elected the second option, and in September 1994, reduced RPT's restructured first priority claim of $2 million to $1.6 million by the payment of $400,000.

Further, under the Plan, the Debtor agreed that it would execute the "RPT Restated Loan Document in form and substance satisfactory to RPT." (*Id.* at 11). RPT's secured claim, which includes both the first priority portion and the portion to be junior to Altchek's subordinated loan, is defined in the Plan as the "RPT Restated Secured Claim." (*Id.* at 5, 11). In September 1994, RPT restated its mortgage (the "RPT Mortgage") to conform to the Plan. (Altchek Ex. D).[2] The RPT Mortgage contains the following relevant language: "Notwithstanding anything to the contrary contained herein, upon the occurrence of an Event of Default and acceleration of the maturity, the priority of repayment of the Debt and Permitted Subordinate Financing shall be as follows:

(i) first, $2,000,000 to Mortgagee less principal payments made under this Agreement;

(ii) second, Permitted Subordinate Financing less principal payments made under the Subordinate Debt Instruments; and

(iii) third, the balance of the Debt."

(Altchek Ex. D at 21).[3]

Unlike the wording of the Plan, the RPT Mortgage expressly provided (i) that only principal payments made under the RPT Mortgage would reduce the senior portion of the restructured RPT loan and (ii) any

---

1. The Exhibits appended to Altchek's Affidavit are referred to as "Altchek Ex.;" the Exhibits appended to Allied's counsel, Daniel M. Litt's Affidavit, are designated as "Allied Ex.;" and the Exhibits appended to John B. Grant, Jr.'s Affidavit are referred to as "Grant Ex." John B. Grant, Jr. is Altchek's counsel.

2. The RPT Mortgage doubled as both the restated promissory note and the restated mortgage. No new promissory note was prepared or executed. *See* Affidavit of J. Blaine Atkisson, dated December 6, 2000. J. Blaine Atkisson is a Vice–President of Allied.

3. The Plan's payment priorities upon default were also described in an Amended Disclosure Statement (Altchek Ex. I) and a Second Amended Payment Agreement between RPT and the Debtor (Altchek Ex. C).

The Amended Disclosure Statement, dated July 13, 1994, described the priority upon default as follows: "... In the event of a default, RPT shall have a first priority for payment up to $2,000,000 less any payments made in accordance with the Plan." (Altchek Ex. I at 9).

The Second Amended Payment Agreement, dated July 14, 1994, also contained the agreed priority: "If prior to payment in full of the then owing Obligation to RPT Metro, the Debtor defaults in any payments to RPT Metro, without curing such default in the applicable cure period, then all amounts owing to RPT Metro prior to the effectiveness of this agreement (an amount currently in excess of $3 Million) shall be due and owing RPT Metro (less any payments from the date hereof), except that the Permitted Subordinate Lien [Altchek's mortgage] shall be senior in right and entitlement to any sum in excess of $2,000,000 less any payments from the day hereof." (Altchek Ex. C at 6).

payments, whether before or after the Debtor's default, shall in the mortgagee's "sole discretion" be applied first to the payment of interest and other costs and charges due, and the balance applied toward the reduction of the principal sum. (Altchek Ex. D at 4). Prepayments, under the RPT Mortgage, whether before or after default, also required the payment of all accrued and unpaid interest, fees, and charges. (*Id.* at 12, 14–15).

The RPT Mortgage "spread, coordinated, combined, consolidated, modified, amended and restated pursuant to the provisions hereof" all of the prior notes and mortgages held by RPT, (Altchek Ex. D at 1), was incorporated into the Plan. (Altcheks's Ex. A at 5, 7–8, 11). In addition, the RPT Mortgage set forth the Debtor and RPT's agreement "to modify the time and manner of payment and the terms and provisions of the [prior] Notes and the [prior] Mortgages." (*Id.*).[4]

Allied took the RPT Mortgage by assignment dated March 24, 1995. (Altchek Ex. E). The Debtor defaulted in its mortgage payments to Altchek and, in May 1997, Altchek commenced a state court mortgage foreclosure action. Allied declared a default under its mortgage by letter dated December 8, 1997. (Altchek Ex. F). The Debtor filed its second Chapter 11 petition on July 2, 1998; it was dismissed in January 1999. This Chapter 11 case, the Debtor's third reorganization effort was filed on July 12, 2000.

On October 2, 2000, Allied filed the instant adversary proceeding seeking a declaratory judgment that its first priority claim includes the unsubordinated principal balance of $1.6 million, plus interest, attorneys' fees, late charges, and other costs that have accrued or were incurred. On November 2, 2000, Altchek answered the complaint and counterclaimed, requesting a declaratory judgment that Allied's priority is fixed at the sum of $1.6 million, less those monies paid by the Debtor or by the state court receiver from the Debtor's property post-default.[5] Both parties concede that RPT's small second mortgage that was not assigned to Allied, maintains a second priority in payment, followed by the Altchek mortgage, and finally the balance of Allied's claim.

Altchek and Allied then moved and cross-moved, respectively, for summary judgment based on their respective pleadings, submissions, affidavits, and exhibits. On February 27, 2001, the Court heard oral argument as to whether Allied is entitled to, as a first priority, interest, fees, and costs with respect to its $1.6 million claim.

### ANALYSIS

The crux of Altchek's gripe is that Allied claims it is entitled to be paid, as a first priority, a sum greater than that given precedence under the Plan and the RPT Mortgage. He thus requests this Court to limit Allied to the agreed priority specified in the aforementioned documents. According to Altchek, Allied is free to apply its post-default collections any way it chooses, *i.e.*, to reduce principal or as interest, provided that after receiving

---

4. Concurrent with the preparation and circulation of the RPT Mortgage, RPT prepared and circulated a Subordination and Intercreditor Agreement (the "Subordination Agreement") to be executed by Altchek and RPT. (Allied Ex. 1). The Subordination Agreement was not signed by the aforementioned parties, (*Id.; see* Affidavit of Daniel M. Litt, sworn to December 6, 2000), and the record is devoid of any definitive explanation for its non-execution.

5. February 27, 2001 Transcript, p. 7. Hereinafter, all references to the transcript will be designated "Tr."

$1,600,000, the next payments go to RPT and then Altchek. However, Altchek concludes that because Allied has received the sum of approximately $356,650, since default, Allied is only entitled to some $1,243,350 before payments are due to RPT and Altchek on their debts.[6] In other words, Altchek's position is that the post-default payments must reduce principal as opposed to being applied to interest.[7]

While Allied agrees that the Plan "was poorly worded" insofar as it uses the words "less any payments" as opposed to "less principal payments," Allied construes "any payments" to *per force* mean "principal payments" and that both parties necessarily so intended. Allied further points out that the RPT Mortgage references the $2 million to the mortgagee less "principal payments" and that Allied relied upon the express terms of the recorded RPT Mortgage. Moreover, Allied argues that unlike the wording of the Plan, the RPT Mortgage expressly provides that only principal payments reduce the senior portion of the RPT loan and that payments, whether before or after the Debtor's default, shall in the mortgagee's sole discretion be applied first to the payment of interest and other costs and charges and the balance applied towards the reduction of the principal sum. Therefore, according to Allied, its priority right to payment of all principal, interest and charges on its $1.6 million senior claim, over Altchek's subordinate loan, is unmistakenly and unambiguously provided for in the loan documents Allied acquired from RPT. In further support of its position, Allied suggests that the priority provision of the Plan was not written for the purpose of "capping the number." (Tr. at 25). Instead, it was written to set forth what would occur in the event the waived part of RPT's claim was to be resuscitated. (*Id.*).[8]

---

**6.** Particularly perturbing to the Court were Altchek's counsel's attempts, in his submissions and oral argument, to obfuscate the issue. *See, e.g.,* Brief Supporting Altchek's Motion For Summary Judgment at 5, 9–10; Reply Brief Supporting Altchek's Motion For Summary Judgment And Opposing Allied And BMI's Cross–Motion at 6–7; Tr. at 15–17; Tr. at 20–22; Tr. at 78–80. For example, when queried as to whether, under Altchek's interpretation, a default would result in a "process of consistent erosion" for Allied, Altchek's counsel's response was "That's correct. Well, no. Consistent erosion by being paid. Their first priority in that gets paid. It goes down as it gets paid...Whatever you want to call it. Interest gets paid. So the rest of it is subordinate." (Tr. at 78–79).

**7.** At oral argument, Altchek's attorney explained the motivation for Altchek's position as follows: "When he [Allied's attorney] talked to you about the equity cushion, he says that the debtor estimated the value of the property at 2.3 [million dollars]. The amount that would be paid down would leave about 675[,000]–700[,000] to cover the Altchek principal amount. It would be precisely for that

reason that Dr. Altchek would not want that number in front of him to grow. Because that's what Allied argues. Notwithstanding the absence of language in the agreement to this effect, it grows from 1.6 [million] plus interest plus default fees plus late charges plus attorneys' fees. And according to them, it's up to $2.2 million now." (Tr. at 77).

**8.** Under the Plan, if the Debtor made all of the payments due on the priority portion of RPT's claim, the subordinate portion disappears. (Altchek Ex. A at 7–8). However, as Allied correctly points out, in the event the Debtor defaults in its payment obligations to RPT on the priority portion and such default is not cured, the full RPT secured claim of over $3 million shall become due. (*Id.* at 8; Tr. at 28). The Plan then provides for the aforementioned order of priority. (Altchek Ex. A at 8; Tr. at 28). Thus, Allied argues that the priority provision was written for the express purpose of assuring Altchek that upon the resurrection of RPT's entire secured claim, any sum due in excess of RPT's prioritized portion would not "jump" ahead of Altchek's claim. (Tr. at 28–29).

Upon consideration of all the evidence and argument submitted, we find that the RPT Mortgage expressly provided that RPT or its successor, Allied, has the right to first apply payments to interest, fees and charges, on its senior loan, whether before or after default, and that a fair reading of the Plan is consistent with Allied's interpretation. We disagree with Altchek's stance for it strains credulity to believe that the parties could have intended that upon default the senior loan becomes frozen, and that only after Altchek's expanding debt, including all interest and charges, are paid in full, would the first priority lender have any chance to recover its interest, fees and costs.[9] Under closer scrutiny, Altchek's stance is even more untenable. As post-default payments are applied only to principal, there is an ever decreasing principal balance upon which to accrue interest. Thus, interest is not simply subordinated-it disappears.[10] Such a result is antithetical to the usual and customary practices in the lending industry. *See, e.g., Spang Industries, Inc. v. Aetna Casualty & Surety Co.,* 512 F.2d 365, 371 (2d Cir.1975), *citing Ohio Savings Bank & Trust Co. v. Willys Corp.,* 8 F.2d 463, 466–67 (2d Cir.1925) (when partial payments have been made, the payment must be applied first to the interest then due, with the surplus discharging the principal *pro tanto* ); *Matter of Froehlich's Estate,* 98 Misc.2d 1, 416 N.Y.S.2d 744 (N.Y.Sur.1979) (normal rule between debtor and creditor is that a payment is applied first to interest and then to principal).[11]

Although the Plan is not very clear, the RPT Mortgage, which was incorporated into the Plan, unambiguously provides that the priority between the RPT loan and Altchek's "Permitted Subordinate Financing" placed as first, "$2,000,000 ... less principal payments under this Agreement." We believe that the RPT Mortgage is consistent with the Plan and that proponents of both the Plan and RPT Mortgage, as a matter of course, intended to reduce RPT or its successor, Allied's, senior loan only by principal payments made pursuant to the Plan.[12]

A common sense reading of the document supports Allied's view that the Plan's use of the phrase "less any payments made to RPT pursuant to the Plan" necessarily means principal payments for the following reasons. First, the only principal payments "pursuant to the Plan" were the initial payment of $400,000, reducing RPT's $2 million senior loan to $1.6 mil-

9. Under Altchek's unusual theory, interest payments made prior to default do not reduce principal; but upon default, when no payment is made pursuant to the Plan, interest payments made must reduce the principal balance.

10. *See Crane v. Craig,* 230 N.Y. 452, 130 N.E. 609 (1921) (where interest is not payable by the terms of the contract but is allowable as a mere incident to it, receipt of the principal bars a subsequent claim for interest since the debt is extinguished by the payment of the principal).

11. The practice of applying monies first to interest and then to principal dates as far back as the eighteenth century. *See Penrose v. Hart,* 1 U.S.(Dall) 378, 1 L.Ed. 185 (1788).

12. For the Court to rule otherwise, there should have been express language in the Plan and the RPT Mortgage, *i.e.,* that RPT would be paid the finite sum of $1.6 million as a first priority and that all post-default payments must reduce the principal or, at least, extrinsic evidence to show this non-conventional practice. Such an express provision or extrinsic evidence to that effect is warranted as case law shows that this manner of payment is clearly not customary or usual in the lending industry. *See Spang Industries, Inc., supra,* and cases cited therein. Altchek failed to produce extrinsic proof to support his position.

lion, and the balloon payment of the $1.6 million at maturity forty-eight months later. On the other hand, upon default, the entire RPT loan became due. All further payments occurred after acceleration and were either incident to the foreclosure action or after the Debtor's second and third Chapter 11 cases under cash collateral orders and not "pursuant to the Plan." Similarly, interest payments "pursuant to the Plan" ceased after acceleration. Interest accrued. It simply was not paid or payable "pursuant to the Plan."

Therefore, this Court finds that payments "pursuant to the Plan" means the initial payment of $400,000, monthly predefault interest payments and the $1.6 million balloon payment. After default and acceleration, no payments are "pursuant to the Plan." Nothing reduces Allied's senior loan except principal payments. Moreover, Allied, like any other lender, is entitled to its interest, fees and charges as part of its senior loan, as it is ordinary and customary for interest, fees, and other charges to accrue and be paid prior to principal upon default. Indeed, the RPT Mortgage expressly provided for the payment of all accrued and unpaid interest, fees, and charges.

Altchek's stance is implausible for other reasons and creates anomalous results. RPT was a senior lender and did not surrender that status under the Plan. Under the Plan, RPT merely agreed that, in the event of default, it would subordinate a portion of its debt to Altchek. Altchek is and always was a subordinate lender. Not surprisingly, under the Plan, RPT was to be paid 6% to 9% interest per annum, while Altchek was to receive interest at 11% and up to 50% of stock in the Debt-or.[13] Common sense dictates that a subordinate loan carries a higher interest rate than a senior loan to compensate for the increased risk. However, under Altchek's exposition, the real world is turned topsy turvy and it is the senior lender, RPT, that bear's the lion's share of the risk. According to Altchek, upon default, RPT's senior debt is frozen, while Altchek's subordinate debt continues to grow. Only after Altchek's expanding debt, increased by interest and other charges, is paid in full, would the senior lender have any opportunity to recoup interest, fees and costs. The end result, if Altchek is correct, is that Altchek as subordinated lender, assumes substantially less risk than RPT (now Allied) and, in effect, is paid a premium for not taking such a risk. Indeed, under Altchek's theory, the longer it takes and the more fees and costs Allied must expend to realize on its senior loan, the less Allied recovers. At the same time, Altchek receives more. Such bizarre consequences defy logic and could not have been intended by the parties.

Our ruling is reinforced by the conduct of the parties. While Allied declared a default by the Debtor back in December 1997, the record shows that it was only after the filing of the Debtor's second Chapter 11 case in 1998 that Altchek articulated any disagreement with the RPT's Mortgage provisions that the first priority lien would be reduced only by principal payments. It was then that Altchek contended that the senior loan must be reduced by any post-default collections and that, after default and acceleration, Altchek's subordinate loan was to have priority over all interest, fees and charges due under the RPT Mortgage. Furthermore,

---

**13.** According to Allied, "Altchek later described this as raising his effective annual interest rate to 17%." Brief In Support Of Allied And BMI's Cross–Motion For Partial Summary Judgment And Opposition to Altchek's Motion for Summary Judgment at 14 n. 5. Altchek does not dispute this valuation.

Altchek took positions in proceedings before this Court inconsistent with the position he now asserts. In the Debtor's second Chapter 11 case, filed on July 2, 1998, Altchek quickly moved to prohibit the Debtor from using cash collateral and for other relief. (Altchek Ex. G; *see* Allied Ex. 2).[14] In his motion, Altchek identified Allied's Senior Loan as being $1,680,000, not $1,600,000. (Allied Ex. 2 at 2). This sum includes $80,000 in accrued but unpaid interest and charges. (*Id.* at 10; Tr. 41–43). If Altchek believed that Allied's interest, fees and costs did not have priority over his loan, Altchek would not have reflected Allied's Senior Loan as exceeding $1.6 million.[15]

Thereafter, the Debtor filed a motion, dated August 21, 1998, for approval of its use of cash collateral in accordance with a proposed Stipulation and Order ("Stipulation") entered into by the Debtor and Allied. (Grant Ex. 1). In his brief, Altchek contends that the issue of Allied's entitlement to priority for post-default interest, fees and costs was not raised by Altchek at that time. (Brief Supporting Altchek's Motion For Summary Judgment at 6—7). However, Altchek did implicitly broadcast his views regarding the issue of Allied's priority entitlement to interest, fees and charges. Altchek initially stated in his objection to the Stipulation: "Contrary to Plan's [Altchek's] entitlement as a secured creditor, the Debtor proposes that it will not provide adequate protection to Plan [*i.e.,* Altchek] until the Debtor's pre-petition arrearages (i.e., interest payments) to Allied and RPT are brought current." (Grant Ex. 2 at 3). Later, Altchek conceded that he was "agreeable to allowing the Cash Collateral to be used to service the interest requirements on the Allied, RPT and Plan [*i.e.,* Altchek] liens." (*Id.* at 10). Thus, Altchek apparently had no objection to the payment of Allied's post-petition interest.

At the September 8, 1998 hearing relating to the Stipulation for use of cash collateral, Allied's counsel advised that Altchek's objections were addressed by certain amendments:

> The two modifications are, first, that Allied is not looking to be paid ahead of the doctor for any amounts which are indeed subordinate tó Dr. Altchek, which he complained that the stipulation was unclear, that as to the (sic) what portion of Allied's first secured position was going to receive interest payments ahead of him.

> While Allied has a 2.6 million, or 2.7 million claim only 1.680 million, approximately, is ahead of the Doctor and where we say that the debtor will pay Allied its interest, we want to make it clear it's only as to that portion which is indeed superior to Dr. Altchek.

(Grant Ex. 3 at 6).

█ Altchek's counsel then spoke.[16] He agreed that cash collateral could be used to make "mortgage payments on the first mortgage." (*Id.* at 8).[17] Altchek argued,

**14.** The Court takes judicial notice of the documents filed which relate to or object to the Debtor's use of cash collateral in this earlier Chapter 11 case. (Allied Exs. 2 & 3; Grant Ex. 4).

**15.** Noteworthy is that the receiver appointed by the state court at the request of Altchek made five "mortgage payments ... on the first mortgage" to Allied without any objection by Altchek or claim that such payments should have reduced Allied's principal claim. (*See* Receiver's Report to Grant Ex. 7).

**16.** At the time, Altchek was represented by Angel & Frankel, P.C.

**17.** Since "mortgage payments" were interest-only payments, Altchek was tacitly acknowledging that after default, Allied's interest payments had priority over Altchek's subordinate loan.

that only Allied's current monthly interest obligations should be paid and that Allied's arrearages await payment under a plan or upon liquidation. (*Id.* at 9). Altchek's counsel objected to the payment of accrued and unpaid interest, fees and charges on the grounds that they were pre-petition arrearages and not because of a subordination to Altchek's loan. (*Id.*). In response to an inquiry as to why Allied should not collect its arrearages, Altchek's counsel never suggested, as his new counsel now does, that Allied had no priority over Altchek's loan.[18] (*Id.*). Thus, it was not until long after default that Altchek seized upon his current interpretation of the Plan and the RPT Mortgage.[19]

## CONCLUSION

For all of the foregoing reasons, Allied's first priority claim consists of the principal balance of $1.6 million, plus interest, attorneys' fees, late charges and other costs and expenses accruing or incurred with respect to the $1.6 million of senior debt, and that all such amounts have priority over any and all amount owing under the Altchek mortgage.

Consequently, Allied's cross-motion for summary judgment for the relief sought in Count One of its complaint is granted and Altchek's motion for summary judgment is denied. Concomitantly, this adversary proceeding is dismissed.

**IT IS SO ORDERED.**

---

**18.** After further argument, the Court held that "the stipulation provides for the payment over to the secured creditors of excess sums in accordance with the order of their contractual priorities." (*Id.* at 19–20). Furthermore, the modifications to the Stipulation and Order made clear that Allied shall be paid all excess income until "Allied's accrued and unpaid interest, charges and fees on its first secured claim in the approximate amount of $1,680,000 are brought current." (Grant Ex. 4 at 7). In appealing the Court's order to the District Court, Altchek again objected to the payment of the pre-petition interest and expense arrearages to Allied. (*See* Allied Ex. 3—Appellant's Brief on Appeal). Thus, on appeal, Altchek again implicitly conceded that post-petition interest payments to Allied had priority over Altchek. (*Id.* at 8).

**19.** While the Court has taken judicial notice of the documents filed with respect to the aforementioned cash collateral motion to support its finding that Altchek's current position is inconsistent with Altchek's previous conduct, it cannot conclude, as Allied urges, that Altchek's actions and statements in the prior proceeding should have preclusive effect based on collateral estoppel. *See Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979); *Rupert v. Krautheimer (In re Krautheimer)*, 210 B.R. 37 (Bankr. S.D.N.Y.1997) (collateral estoppel treats as final only those questions actually and necessarily decided and fully and fairly litigated in a prior proceeding). In the instant matter, Allied's entitlement to post-default interest, fees and other charges was neither necessarily decided or fully litigated in any prior proceeding.